**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

RYAN WATSON,

        Petitioner,

v.                                   Case No: 8:22-cv-2613-WFJ-TGW

DANUTA WATSON,

        Respondent.

_____/

## <u>ORDER DENYING PETITION</u>

This matter comes before the Court on Petitioner Ryan Watson's Verified Hague Convention Petition, Dkt. 1. Petitioner asserts that the parties' two minor children—thirteen-year-old B.V.W. and ten-year-old G.L.W.—have been wrongfully removed to and retained in the United States and must be returned to Canada pursuant to the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention"), as enforced by the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 *et seq.* Respondent Danuta Watson filed an Answer with affirmative defenses. Dkt. 24.

During a two-day evidentiary hearing, the Court benefitted from the testimony of Petitioner, Respondent, and several witnesses. Dkts. 35 & 39. Upon Respondent's motion, Dkt. 33, the Court also interviewed the minor children

individually outside the presence of the parties and their counsel,[1] *see* Dkt 36. Both

parties submitted written closing arguments following the evidentiary hearing.

Dkts. 43 & 44. After careful consideration of all filings and testimony, the Court

denies Petitioner's petition.

## FINDINGS OF FACT

Petitioner and Respondent met in 2001 while both parties were residing in

Canada. Petitioner is a Canadian citizen, and Respondent is a dual citizen of

Poland and Canada. After dating for several years, the parties married in June 2008

at a destination wedding in Florida. It was at that time that the parties decided that

they wanted to move to Florida. The parties returned to Canada from their

honeymoon and began researching immigration options. Shortly thereafter, while

still living in Canada, the parties welcomed the birth of their first child, B.V.W., in

2009. Dkt. 1 at 33.

After B.V.W.'s birth, the parties learned that they could legally move to the

United States if Petitioner became a "skilled worker," which he could do by

becoming a nurse. The parties thus began making plans to move to Florida so

Petitioner could attend nursing school on a student visa. In April 2010, after selling

---

[1] Present during the Court's in camera interviews of the children were the undersigned, a court reporter, and a law clerk.

their house in Canada, the parties purchased a home in North Port, Florida. The

following year, when B.V.W. was approximately eighteen months old, the family

permanently relocated to North Port, and Petitioner began nursing school in the

neighboring city of Sarasota. In 2012, Respondent gave birth to the parties' second

child, G.L.W., in Florida. Dkt. 1 at 34. Petitioner subsequently graduated from

nursing school and obtained a visa that permitted the family to continue living in

Florida while Petitioner worked as a nurse.

While living in North Port, the parties decided to homeschool B.V.W. for a

year or two. The parties then enrolled B.V.W. in second grade and G.L.W. in

kindergarten at a local Christian school. A few years later, the parties enrolled the

children in a different Christian school in the area. The family also attended a

North Port church on a weekly basis. By all accounts, B.V.W. and G.L.W. were

well-adjusted to their North Port community. B.V.W. and G.L.W. had multiple

friends at church and both schools, and they actively participated in social

activities, such as choir, summer camp, and a Christian organization similar to the

Girl Scouts of America. The family also had seasonal relatives in the North Port

area, including Respondent's aunt who testified to spending time with the children

and their friends.

3

Though the family loved living in Florida, Respondent and Petitioner's relationship was admittedly "toxic." Respondent recalled that, while the parties' marriage did not start out poorly, Petitioner had a problem with anger and violence that became increasingly worse in 2015 or 2016. This worsening issue was compounded by Petitioner's development of an opiate addiction. Petitioner began to steal controlled substances from the hospital where he worked, prompting the hospital to conduct an internal investigation in October 2017. When confronted by his employer, Petitioner admitted to diverting controlled substances for personal use and was immediately placed on leave. Because he was a licensed nurse, Petitioner was able to participate in Florida's Intervention Project for Nurses ("IPN"). While taking part in IPN, Petitioner was strictly monitored for drug use and was required to participate in therapy. Petitioner also attended an in-patient rehabilitation program, Alcoholics Anonymous, and Narcotics Anonymous meetings.

Though Petitioner was seeking treatment, Petitioner's diversion of controlled substances led to his February 2018 arrest on five counts of Larceny Grand Theft of Controlled Substance and five counts of Drug Possession Controlled Substance without Prescription. In 2019, Petitioner pled no contest to the charges in Florida

state court and was sentenced to sixty days in jail followed by four years of probation. Petitioner thereafter voluntarily relinquished his nursing license.

As Petitioner continued treatment, issues at home concerning his anger and violence continued. Respondent testified that Petitioner constantly screamed at her and would threaten her life in front of B.V.W. and G.L.W. Petitioner admitted to having struggled with anger management throughout his life and acknowledged that he would scream at Respondent in front of the children. On one occasion, the North Port police responded to a 911 call that Respondent made during an altercation between the parties at their home. Though the details of this incident are not entirely clear, B.V.W. and G.L.W. were present.

Others who knew the family in North Port testified to learning of Petitioner's anger and violence. Rebekah Gritton, the wife of the family's pastor, testified to having a conversation with Respondent that made her concerned about Petitioner's anger. Mrs. Gritton testified that she feared for Respondent's safety, so she created a "code question" to ask Respondent over the phone in instances where Respondent might be in need of police assistance but unable to call 911. She recalled one incident in which she answered a phone call from Respondent and only heard the sounds of Respondent and Petitioner fighting, followed by Respondent crying out in pain. Similarly, Nicole Gugliotta—another individual

5

from the family's church—testified that Respondent and the children once sought refuge at her home after an altercation that made Respondent fear for her safety.

In October 2018, a Charlotte County domestic violence resource organization referred the family to Robin Smith-Velazquez, a licensed clinical social worker specializing in domestic violence and child trauma. Mrs. Smith-Velazquez thereafter became B.V.W. and G.LW.'s therapist. Based on what the children purportedly revealed to her in their individual sessions, Ms. Smith-Velazquez testified[2] that she was concerned for the children's emotional and psychological safety, as well as Respondent's physical safety. Mrs. Smith-Velazquez explained that, in her clinical impression, the children were being negatively affected by the domestic violence they were witnessing at home.

Concerning this, Ms. Smith-Velazquez testified that B.V.W. spoke of witnessing several incidents of domestic violence by Petitioner against Respondent. Respondent later provided a detailed account of one of these incidents, stating that Petitioner became angry with her as he drove the family home from a church function in April 2020. Petitioner allegedly screamed at

---

[2] Petitioner objected to Mrs. Smith-Velazquez's testimony based on the children's psychotherapist-patient privilege afforded by Florida law. However, during the undersigned's in camera interview of thirteen-year-old B.V.W., the child stated that she did not mind if the therapist testified. Out of an abundance of caution, the Court later gave Petitioner the opportunity to strike the therapist's testimony in its entirety. Petitioner declined to do so and stated that the Court could consider the testimony, essentially withdrawing any previous motion to strike.

Respondent, accused her of having an affair, and used his fist to push her head against the car window as B.V.W. and G.L.W. cried in the backseat. Respondent described fearing for the family's lives in that instance, as Petitioner was driving at a high rate of speed and refused to stop the car.

Respondent testified that the car incident prompted her to take the children to a hotel for the night—something she had to do on a number of prior occasions to escape Petitioner's abuse while living in Florida. Indeed, Ms. Smith-Velazquez testified that both children separately spoke of multiple instances in which Respondent took them to hotels in the middle of the night due to Petitioner's violence. The therapist stated that the children expressed that those incidents were frightening. Ms. Smith-Velazquez ultimately described B.V.W. and G.L.W. as having experienced trauma from their exposure to domestic violence, noting that both children had developed a generalized fear of Petitioner's anger and "what [Petitioner] was going to do next."

Galewa Tetena, a longtime friend of the family, likewise testified to having conversations with the children that led her to believe they feared Petitioner. When asked by opposing counsel why she did not leave Petitioner, Respondent explained that she wanted to, but she was scared. Relevant to this testimony is the fact that

Respondent's legal resident status was contingent on that of Petitioner. Respondent was also ineligible to work in the United States.

Unfortunately, Petitioner's own legal resident status became an issue in June 2020 when he was detained by Immigration and Customs Enforcement ("ICE") at a probation meeting. Due to Petitioner's conviction for theft and drug possession, ICE initiated deportation proceedings against him. Petitioner testified that the couple "fought tooth and nail for [him] to remain in the United States" before accepting that he had to return to Canada. Consequently, the parties began sharing their plans to relocate to a new country. Mrs. Gritton testified that the parties clearly expressed their intentions to live in "any country other than Canada." Similarly, both Ms. Tetena and Amanda Doucette—another family friend of many years—recalled separate instances in which both Respondent and Petitioner discussed plans of moving out of Canada after a temporary stay.

In July 2020, Petitioner returned to Canada after accepting ICE's offer of voluntary departure. Following the sale of the family's North Port home, Respondent and the children reunited with Petitioner in Canada in September 2020. For a few months, the family resided with Respondent's mother in Ontario. The parties then moved 950 miles east and purchased a home in Moncton, New Brunswick, in January 2021.

Upon moving to Moncton, Petitioner began working as a personal trainer, and Respondent worked at a pet store as a dog groomer. The parties chose to homeschool B.V.W. and G.L.W. using a Christian homeschooling program that used the same curriculum as the North Port school that the children had most recently attended. Petitioner testified that, for around two months, the children also took part in a homeschooling social group that met at their church. When asked by opposing counsel to name some of the children's friends in Canada during this time, Petitioner provided four names of children whom he called "neighborhood kids." However, Respondent later clarified that three of the four children named by Petitioner were actually B.V.W. and G.L.W.'s cousins who lived near Toronto—about a fifteen-hour drive from Moncton.

In Moncton, the children continued to witness domestic violence at home. Respondent testified that, in March 2021, Petitioner grabbed her arm during an argument and threw her to the floor with such force that she believed he had broken her arm. Respondent recalled that B.V.W. and G.L.W. were screaming as they witnessed this incident. Respondent testified that Petitioner was later remorseful when she showed him the substantial bruise that he had caused to her arm. A photo of the bruise was presented during the hearing. Though Petitioner recalled the fight and seeing the "fairly large" bruise that had developed on

Respondent's arm shortly thereafter, he denied being the cause. The Court did not find Petitioner's testimony on this point to be credible.

In October 2021, about seven months after the aforementioned physical altercation, Petitioner moved out of the family's Moncton home to live with a woman with whom he had been having an extramarital affair. After Petitioner moved out of the family home, B.V.W. and G.L.W. would visit him at his girlfriend's home while the girlfriend was at work. Petitioner would also take the children to restaurants and parks.

In late November 2021, Respondent told Petitioner that she needed to take the children to the United States so that G.L.W. could attend an appointment with an endocrinologist in Florida. Respondent testified that G.L.W. could not be seen by an endocrinologist in Canada because G.L.W.—who lacks Canadian citizenship—was not covered by the Canadian National Healthcare System. Petitioner testified that he consented to the trip, which he believed would only be for a few weeks, and helped Respondent load the car. At some point around this time, Respondent emailed Petitioner's aunt, stating that she was taking the children to Florida for the aforementioned appointment and to "regroup and recover." Dkt. 40-13. Respondent further stated that maybe one day she would share the "truth and severity of the situation with [Petitioner]." *Id.* Respondent and the children

10

crossed the Canadian-United States border on November 25, 2021. *See* Dkt. 24-9 at 1.

After attending G.L.W.'s endocrinologist appointment in Florida on November 30, 2021, Dkt. 24-7, Respondent and the children stayed in the North Port area with Respondent's friends and aunt. Though Respondent purportedly told her Moncton employer that she would return to work on December 17, she did not return to Canada. Rather, about a week after leaving Canada, Respondent called Petitioner to tell him that she and the children would be permanently staying in Florida.

Respondent and the children moved into a rental home in North Port in January 2022. Respondent enrolled the children in the same Christian school they had last attended in the area. Around that time, Respondent also resumed the children's therapy sessions with Ms. Smith-Velazquez and hired an immigration attorney. About six months later, the parties sold their Moncton home. Petitioner, who no longer resides with his girlfriend, has since moved into an apartment attached to a house in Riverview, New Brunswick.

In October 2022, Respondent filed a petition for dissolution of marriage in Lee County. One month later, Petitioner filed his present Verified Hague Convention Petition for the return of B.V.W. and G.L.W. to Canada. Dkt. 1. In

11

December 2022, Respondent voluntarily dismissed her petition in Lee County and refiled in Sarasota County, where she lived at the time. Dkt. 24-6. She and the children have since moved to Punta Gorda in Charlotte County. Dkt. 24 at 9−10.

## LEGAL STANDARD

Adopted in 1980, the Hague Convention seeks to resolve the issue of international child abduction during domestic disputes. *Abbott v. Abbott*, 560 U.S. 1, 8 (2010). The Hague Convention aims to ensure that custody decisions are made in a child's country of "habitual residence." *Monasky v. Taglieri*, 140 S. Ct. 719, 723 (2020). Accordingly, a court faced with a Hague petition may only evaluate the merits of a petitioner's wrongful removal or retention claim, not any underlying custody disputes. *Gomez v. Fuenmayor*, 812 F.3d 1005, 1011 (11th Cir. 2016). In 1988, Congress passed ICARA to guarantee the implementation of the Hague Convention's provisions in the United States. Notably, the Hague Convention only applies where a child is under the age of sixteen years old and both subject countries are contracting parties to the Convention.

A petitioner bears the burden of establishing by a preponderance of the evidence a prima facie case of wrongful removal or retention. *Berenguela-Alvarado v. Castanos*, 950 F.3d 1352, 1358 (11th Cir. 2020) (citations omitted). This requires a petitioner to make a three-part showing. First, the petitioner must show

the child was a habitual resident of the country to which the petitioner seeks the child's return. Hague Convention art. 3. Second, the petitioner must establish that the child's removal or retention violated the petitioner's custody rights under the laws of the country in which the child was a habitual resident. *Id.* Third, the petitioner must demonstrate that he or she was actually exercising those custody rights at the time of the removal or retention, or that he or she would have been exercising those rights but for the removal or retention. *Id.* Where a petitioner meets the burden of establishing these elements by a preponderance of the evidence, a court typically "shall order the return of the child forthwith." *Id.* art. 12; *see also* 22 U.S.C. § 9001(a)(4); *Lozano v. Montoya Alvarez*, 572 U.S. 1, 14 (2014); *Baran v. Beaty*, 526 F.3d 1340, 1345 (11th Cir. 2008).

There are, however, several exceptions to the Hague Convention's mandate that a wrongfully removed or retained child must be returned to his or her place of habitual residence. A court is not bound to order the return of a child if the respondent demonstrates by a preponderance of the evidence that one of the following exceptions applies: the petitioner "had consented to or subsequently acquiesced in the removal or retention," Hague Convention art. 13(a); "the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views," *id.*; or the proceedings seeking the

child's return were commenced more than one year after the date of the wrongful

removal or retention and "it is determined that the child is now settled in its new

environment," *id.* art. 12. Nor must the court return a child where the respondent

shows by clear and convincing evidence that "there is a grave risk that his or her

return would expose the child to physical or psychological harm or otherwise place

the child in an intolerable situation," *id.* art. 13(b), or that returning the child

"would not be permitted by fundamental principles of the requested State relating

to the protection of human rights and fundamental freedoms," *id.* art. 20.

The Eleventh Circuit has emphasized that "narrow interpretations of these

exceptions are necessary to prevent them from swallowing the rule and rendering

the Convention a dead letter." *Gomez*, 812 F.3d at 1011. Even when the respondent

establishes one or more exceptions, a court may still order the return of a child.

Hague Convention art. 18; *see also Lozano*, 572 U.S. at 20 (Alito, J., concurring);

*Baran*, 526 F.3d at 1345. A district court ultimately has considerable discretion in

deciding whether a wrongfully retained child should be returned to his or her

country of habitual residence.

## CONCLUSIONS OF LAW

As a preliminary matter, the two threshold requirements governing the

Hague Convention's application—the children's ages and the countries' dual

14

contracting status—are met here. It is undisputed that the parties' minor children, B.V.W. and G.L.W., are younger than sixteen years old, and both Canada and the United States are contracting parties to the Hague Convention.

## I. Petitioner's Prima Facie Case

To establish a prima facie case of wrongful removal or retention under the Hague Convention, Petitioner must prove by a preponderance of the evidence that: (1) G.L.W. and B.V.W. were habitual residents of Canada immediately before the removal or retention; (2) the removal or retention breaches Petitioner's custody rights under Canadian law; and (3) Petitioner was exercising those custody rights at the time of the removal or retention. *See* Hague Convention art. 3; *Chafin v. Chafin*, 742 F.3d 934, 938 (11th Cir. 2013). The Court turns first to the habitual residence prong.

### A. B.V.W. and G.L.W.'s Habitual Residence

While neither the Hague Convention nor ICARA defines "habitual residence," the Supreme Court has held that the phrase necessitates a fact-sensitive inquiry. *Monasky*, 120 S. Ct. at 726. While dependent on a "totality of the circumstances," a child's habitual residence tends to lie in "the family and social environment in which [the child's] life has developed." *Id.* In determining whether a child's habitual residence has changed from one country to another, highly

15

relevant factors suggesting a child's acclimation to a new habitual residence

include, among other things, the child's age, academic activities, and social

engagements, as well as the passage of an appreciable period of time. *Id.* at 727 &

n.3.

In such cases, courts also consider whether the child's parents shared a

settled intention to change the child's habitual residence. *Id.* at 727. Where the

parents do not share this settled intention, a change in a child's habitual residence

is unlikely "unless objective facts point unequivocally to a change" in the child's

"relative attachments to the two countries" such that returning the child to the

original country "would now be tantamount to changing the child's family and

social environment." *Chafin*, 742 F.3d at 939; *see also Stirk v. Lopez*, No. 8:20-cv-

2894-SDM-AAS, 2021 WL 1139664, at *4 (M.D. Fla. Mar. 25, 2021).

Here, it is clear that B.V.W. and G.L.W. were habitual residents of the

United States prior to moving to Canada in September 2020. At that time, eleven-

year-old B.V.W. had lived in Florida since she was eighteen months old, and eight-

year-old G.L.W. had lived in Florida since birth. The children attended schools and

a church in North Port, and they actively participated in multiple community

activities. They also had several friends and some extended family members in the

North Port area. B.V.W. and G.L.W. were undoubtedly habitual residents of the

United States at the time of their move to Canada. Petitioner therefore bears the burden of establishing by a preponderance of the evidence that the children's habitual residence changed from the United States to Canada by the time Respondent removed the children to the United States in late November 2021. The Court finds that Petitioner has not carried this burden.

Credible testimony at the hearing established that the parties did not share a settled intention to make Canada the children's new habitual residence. Respondent and several of her witnesses credibly testified that neither Respondent nor Petitioner planned for the family to remain in Canada. Though the parties purchased a home in Moncton in January 2021, Respondent testified that this decision was not reflective of an intent to stay in Canada but, instead, high rental prices. This testimony was compounded by that of Ms. Doucette, who recalled Petitioner stating that the family's move to Moncton would be temporary and that the family planned to move to Europe or find a way back to the United States. Indeed, Petitioner's own testimony revealed an intent to leave Canada. Petitioner testified that, even after moving to Moncton, the parties discussed relocating to Europe or Panama. On this record, there was no shared intention to change the children's habitual residence to Canada.

17

In the absence of a shared settled intention, the Court further finds that the objective facts do not "unequivocally point to a change in the [children]'s relative attachments between the two countries" such that the children's return to the United States from Canada in 2021 was "tantamount to changing the [children]'s family and social environment." *See Chafin*, 742 F.3d at 939. Credible testimony reveals that B.V.W. and G.L.W. did not become acclimated to Canada to the degree that Canada could be said to have replaced the United States as the children's family and social environment.

Apart from discussions of the children's online homeschooling curriculum, there was no testimony of the children's activities and engagements during the roughly four months that they lived in Ontario with Respondent's mother. And once in Moncton, there were still few signs suggesting acclimation. For instance, in Moncton, the children did not attend a local school. Rather, they were homeschooled using the same Christian curriculum used by their former school in North Port. Moreover, the extent of the children's community activities and engagements appears to have been regularly attending church, going to the YMCA and—for two months prior to leaving Canada—participating in a homeschooling social group.

Though Petitioner attempted to name four of the children's friends in Moncton, he could only name one. The other three "neighborhood kids" named by Petitioner were B.V.W. and G.L.W.'s cousins who lived about fifteen hours away. During the Court's interviews of the children, B.V.W. stated that she and G.L.W. were not close to many people in Canada. G.L.W. similarly shared that she only had one friend in Canada. Additionally, though some of the children's extended family members lived in Florida (albeit seasonally), none lived in Moncton, New Brunswick.

When comparing the children's relative attachments to the United States and Canada, it is clear that the children's 2021 return to the United States was not tantamount to "changing the [children]'s family and social environments." *See Chafin*, 742 F.3d at 939. Rather, the children's return to the United States is best characterized as a return to their habitual residence. After living in Ontario for a few months and New Brunswick for less than a year, B.V.W. and G.L.W. moved back to the same Florida community—including their school, church, friends, relatives, and activities—that they had known for nearly a decade.

Based on the foregoing, the Court concludes that Petitioner has failed to show by a preponderance of the evidence that B.V.W. and G.L.W. were habitual residents of Canada at the time of their removal or retention. As demonstrated

19

through credible testimony and record evidence, the totality of the circumstances establishes that the children did not develop a family and social environment in Canada sufficient to constitute a change of their habitual residence from the United States to Canada.

Given that Petitioner has not carried his burden of establishing Canada as the children's habitual residence, he is unable to prove a prima facie case of wrongful removal or retention. Accordingly, the Court need not assess whether Petitioner has established the remaining two prongs of his prima facie case.

## II. Respondent's Affirmative Defenses

Even if Petitioner had established a prima facie case of wrongful removal or retention, the Court finds that Respondent has proven two affirmative defenses: the mature child exception and a grave risk of harm. The Court discusses Respondent's showing of both affirmative defenses in turn.

### A. Mature Child Exception

Referred to as the "mature child exception," the Hague Convention provides an affirmative defense where the respondent proves by a preponderance of the evidence that "the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Hague Convention art. 13(a). In determining whether the mature child exception applies,

20

courts consider three factors: "(1) whether the child is sufficiently mature; (2) whether the child has a particularized objection to being repatriated; and (3) whether the objection is the product of undue influence." *Romero v. Bahamonde*, 857 F. App'x 576, 583 (11th Cir. 2021).

Concerning the first factor, a "child's age, ability to express mixed feelings, and to plan past obstacles" may indicate maturity. *Id.* As for the second factor, determining whether a child has a particularized objection requires a court to "consider whether the child is expressing merely a preference against return or is 'affirmatively objecting to returning to one country—when living in that country would be unacceptable.'" *Id.* (quoting *Rodriguez v. Yanez*, 817 F.3d 466, 477 (5th Cir. 2016)). Finally, with respect to the third factor, "courts place great weight on whether the objection is based on the child's firsthand experiences." *Id.* As set forth below, the Court finds that Respondent has established each of these factors concerning both children.

### 1. B.V.W.

The Court first turns to thirteen-year old B.V.W. As the Court noted at the evidentiary hearing, the undersigned found the eighth grader to be very bright and articulate. In her interview, B.V.W. confidently described North Port as "home." When asked for her thoughts on Canada, B.V.W. noted that she had only lived

21

there for about a year and stated that neither she nor G.L.W. were close to many people there. B.V.W. further described her strained relationship with Petitioner and clearly expressed her desire not to return to Canada with him.

The Court finds that B.V.W. is sufficiently mature for the Court to consider her aforementioned views. B.V.W. is an intelligent child who articulately expressed her feelings relevant to the present proceeding. The Court further finds that B.V.W. stated a particular objection to returning to Canada based on her relative attachments to Canada and the United States, as well as her strained relationship with Petitioner. The Court does not find that this objection was prompted by undue influence, as B.V.W. shared her firsthand experiences underlying her views. Accordingly, the Court finds that the mature child exception applies with respect to B.V.W.

## 2. G.L.W.

The Court also spoke with ten-year-old G.L.W., who is currently in the fifth grade. As with B.L.W., the Court found G.L.W. to be an intelligent and articulate child. During her interview, G.L.W. described "home" as Florida. G.L.W. explained that she only had one friend in Canada, and, while living there, she and her sister always asked Respondent when they would be able to return to Florida.

G.L.W. stated that, though she would not mind visiting Canada, she did not want to live there.

The Court finds G.L.W. to be sufficiently mature for purposes of considering her views. Though younger than her sister, G.L.W. is certainly a bright, competent, and composed child. G.L.W. also expressed a particular objection to living in Canada. Though she is open to visiting Canada, she made clear that she does not wish to not leave her "home" of Florida. The Court did not find any indication that this objection was the product of undue influence. Rather, G.L.W.'s objection was based on her firsthand experiences of living in both Canada and Florida. As such, the Court finds that the mature child exception applies to G.L.W.

Having determined that the mature child exception applies to both children, the Court concludes that, even if Petitioner had established a prima facie case of wrongful removal or retention, the Court would decline to order the children's return to Canada.

### B. Grave Risk of Harm

In addition to establishing the application of the mature child exception, Respondent has proven the existence of a grave risk of harm. This affirmative defense requires a respondent to show by clear and convincing evidence "a grave

risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention art. 13(b); 42 U.S.C. § 11603(e)(2)(A). "Grave risk means something more than serious risk." *Uribe v. Luque*, No. 8:21-cv-934-SDM-CPT, 2021 WL 3518154, at *4 (M.D. Fla. May 3, 2021) (citations and internal quotes omitted).

The Court received evidence and credible testimony that B.V.W. and G.L.W. have witnessed Petitioner's domestic violence against Respondent in Florida and Canada. Though Petitioner denied ever physically harming Respondent, the Court found Respondent's testimony to the contrary to be more credible. Consistent with Ms. Smith-Velazquez's testimony concerning the children's disclosures in therapy sessions, Respondent recalled incidents in Florida of Petitioner tearing her clothes in front of the children and, on a separate occasion, pressing her head against a car window while driving at a high rate of speed with the children crying in the backseat. Mrs. Gritton, the wife of the family's pastor, also credibly testified to answering a phone call from Respondent only to hear the parties fighting and Respondent crying out in pain. This continued in Canada, where the children witnessed Petitioner's physical abuse of Respondent that left her with a substantial bruise on her arm.

The abuse the children witnessed was not just physical, but psychological. Respondent testified to having to leave with the children in the middle of the night on more than a few occasions to escape Respondent's anger while living in Florida. This tracked the testimony of Ms. Smith-Velazquez, who testified that B.V.W. and G.L.W. had disclosed the frightening nature of these incidents. Petitioner admitted to having anger issues and frequently screaming at Respondent in front of the children. No doubt blame for domestic discord lies here on both parties to some extent. Petitioner's opioid addiction, criminal prosecution, and deportation (as well as his moving out of the family home and cohabitating with the girlfriend) was both a likely cause and likely result of this toxic marriage.

As the Eleventh Circuit has explained, it would be unrealistic to "ignore the powerful effect that a pattern of serious violence directed at a parent may have on [] children." *Gomez*, 812 F.3d at 1014. Even Petitioner acknowledged that witnessing abuse—whether emotional or physical—is emotionally damaging to children. The Court finds Ms. Smith-Velazquez's testimony compelling regarding the trauma experienced by B.V.W. and G.L.W. from witnessing such abuse. The children presently continue to work through that trauma in therapy with Ms. Smith-Velazquez. Moreover, Ms. Smith-Velazquez testified to her genuine concern for the children's psychological and emotional well-being if made to return to Canada

with Petitioner. Importantly, she noted that children have a generalized fear of Petitioner's anger and unpredictable actions. Mrs. Tetena likewise testified that, from her own conversations with the children, she believed B.V.W. and G.L.W. were afraid of Petitioner. B.V.W. independently and credibly expressed this fear during her in camera interview.

Considering all of the evidence and credible testimony, the Court finds that Respondent has shown by clear and convincing evidence a grave risk of psychological harm to B.V.W. and G.L.W. if ordered to return to Canada. This evidence and credible testimony establish that the children have suffered trauma by witnessing domestic turmoil for multiple years. Regardless of whether Respondent accompanied them, ordering the return of the children to Canada would only exacerbate that trauma, gravely risking their psychological well-being.

Accordingly, even if Petitioner had established a prima facie case of wrongful removal or retention, the Court would decline to order the return of the children to Canada based on its finding of a grave risk to harm.

## CONCLUSION

As set forth above, the Court finds that Petitioner has not carried his burden of establishing a prima facie case of wrongful removal or retention, while Respondent has carried her burden of establishing two affirmative defenses.

Petitioner's Verified Hague Convention Petition, Dkt. 1., is therefore **DENIED**.

The Clerk is directed to enter judgment accordingly and close the case.

      **DONE AND ORDERED** at Tampa, Florida, on February 13, 2023.

                    */s/ William F. Jung*_____

                    **WILLIAM F. JUNG**

                    **UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO:**
Counsel of Record